# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT

        *Plaintiff*,

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; KEVIN K. MCALEENAN, in
his official capacity as Acting Secretary of the
Department of Homeland Security; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; KENNETH T. CUCCINELLI, in
his Official Capacity as Acting Director of
U.S. Citizenship and Immigration Services;
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; MATTHEW T.
ALBENCE, in his official capacity as Acting
Director for U.S. Immigration and Customs
Enforcement; U.S. DEPARTMENT OF
JUSTICE; WILLIAM P. BARR, in his official
capacity as United States Attorney General;
EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW; JAMES MCHENRY, in his official
capacity as Director of the Executive Office
for Immigration Review;

        *Defendants*.

No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     The State of Connecticut files this civil action to protect its sovereign rights and

the constitutional rights of its residents. The action is necessary because, without adequately

explaining or even acknowledging its reversal, Defendants have abruptly abandoned 66 years of

settled practice and singled-out Connecticut's government, laws, and residents for deeply

unequal and prejudicial treatment in the nation's immigration system by refusing to recognize

Connecticut pardons. On information and belief, Defendants respect and credit the pardons of every state in the nation except those issued in Connecticut.

2.      The Pardon Waiver Clause ("Clause") of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(vi), provides a critical protection against removal for noncitizens who have earned second chances. Ordinarily, a noncitizen (an "alien" in the parlance of the INA) who has committed an enumerated criminal offense is subject to removal. But under the Pardon Waiver Clause, a noncitizen cannot be removed for commission of an offense if they have "been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States."

3.      On information and belief: For 66 years – from the time of the passage of the INA in 1952 until the summer of 2018 – the federal government accorded Connecticut and its residents the same rights, prerogatives, and protections afforded to the other 49 states and their residents under the Pardon Waiver Clause. Throughout that period, when Connecticut's Board of Pardons and Paroles ("Board") granted a full and unconditional pardon to a noncitizen, the federal government honored its obligation to waive the pardoned person's removal.

4.      The federal government's history of respecting Connecticut's pardoning scheme meant that Connecticut enjoyed equal sovereignty with its sister states. Consequently, Connecticut's residents – citizens and noncitizens alike – benefitted when immigrants who earned pardons were able to remain in the country, live with and support their families, and continue to strengthen the state and its communities.

5.      In or about 2018, however, Defendants sharply broke from settled practice. Defendants adopted a pattern and practice of refusing to recognize Connecticut pardons, based

on a novel, illogical, and unsupported reading of Connecticut's pardon process. Defendants began insisting, incorrectly, that Connecticut's pardon system was somehow unique, and uniquely disfavored. In a pattern and practice of agency actions, Defendants arrogated to themselves the power to remove a noncitizen for commission of a crime even if the noncitizen has earned a full, complete, and unconditional pardon from Connecticut.

6.      Five other states have pardon systems that are functionally identical to Connecticut's system – and, on information and belief, the federal government continues to accord full effect to those states' pardons under the Pardon Waiver Clause.

7.      By disregarding Connecticut's pardons, Defendants have violated Connecticut's prerogative, protected by the Tenth Amendment, to structure and exercise its sovereign pardoning power. By irrationally singling Connecticut out from among its 49 sister states without any showing of need, Defendants have violated the constitutional principle of equal sovereignty. And by reversing course abruptly and departing without reasoned explanation from a settled practice that was mandated by the history, intent, and logic of the Pardon Waiver Clause, Defendants have violated the Administrative Procedure Act's (APA) prohibitions against agency actions that are arbitrary, capricious, and contrary to law.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Administrative Procedure Act, 5 U.S.C. § 706, and the Tenth Amendment of the U.S. Constitution. Declaratory relief is authorized under 28 U.S.C. § 2201.

9.      Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §§ 1391(b) and (e)(1). Defendants are United States agencies or officers sued in their official capacities;

Plaintiff, the State of Connecticut, is a resident of this judicial district; and a substantial part of the events or omissions giving rise to this action occurred and are continuing to occur in this district.

## PARTIES

**Plaintiff State of Connecticut**

10.     The State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America. Ned Lamont, the Governor of the State of Connecticut, has authorized the Attorney General to bring this action. The Attorney General is Connecticut's chief legal officer, with supervision over civil legal matters in which the State is an interested party. Conn. Gen. Stat. § 3-125.

11.     Connecticut brings this suit to vindicate its sovereign interests in promoting the integrity and efficacy of its laws; in protecting its core structures of state government against incursion, cooption, and domination by the federal government; and in preserving its equal sovereignty alongside its sister states.

12.     Connecticut also brings this suit to vindicate its quasi-sovereign interest in promoting and protecting the health, safety, and well-being of its residents – the noncitizens who are threatened with illegal and unconstitutional removal because of Defendants' practices, and the families and communities who will be fractured by those wrongful removals.

13.     Finally, Connecticut seeks, through this action, to protect its proprietary interests. Defendants' practices imminently threaten real administrative costs to Connecticut's state government, which absent intervention by this Court will be forced to restructure its pardon system, and even rewrite its state constitution, if it wishes to offer deserving noncitizens the full

benefits of a second chance. If Connecticut does not bend to Defendants' whim and restructure its pardon system, it will suffer the costs of wrongful removal of its residents, including a cruel and unnecessary separation of family members, reduced tax payments received from noncitizen residents, and increased social support benefits that the State will paid to families that have been robbed of their breadwinners by Defendants' actions.[1]

**Defendants**

14.     Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet department charged, *inter alia*, with administering and enforcing federal immigration law.

15.     Defendant Kevin V. McAleenan is Acting Secretary of DHS. He is responsible for developing, promulgating, implementing, and overseeing the policies and practices of DHS' component agencies. He is sued in his official capacity.

16.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is a component agency of DHS. USCIS is charged, *inter alia*, with processing and adjudicating applications for citizenship and lawful immigration status in the United States.

---

[1] Plaintiff does not know the full extent of the harm done by Defendants' illegal and unconstitutional conduct, as Defendants have failed to disclose that information to Plaintiff. DOJ's Civil Division, Office of Immigration Litigation ("OIL") has conceded, in writing, that DOJ does not track how many people have had their Connecticut pardons disregarded and disrespected by Defendants. *See* Attachment 3 (OIL Letter). At least 2,256 Connecticut residents received pardons in the 2016, 2017, and 2018 calendar years; thousands more received pardons in the years before. Plaintiff does not and cannot know which or how many of these residents have been denied the benefits of the Pardon Waiver Clause. Plaintiff does know that, indisputably, two Connecticut residents – Wayzaro Walton and Richard Marvin Thompson, whose cases are discussed below, and their families and communities – have suffered and continue to suffer real and measurable harms because of Defendants' pattern and practice of refusing to recognize Connecticut pardons. Only discovery can reveal the scale and nature of the other harms that Defendants' actions have engendered.

17.     Defendant Kenneth Cuccinelli is the Acting Director of USCIS. He is responsible for developing, promulgating, implementing, and overseeing USCIS' policies and practices. He is sued in his official capacity.

18.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS. ICE is charged, *inter alia*, with enforcing the federal immigration law by arresting, detaining, prosecuting, and deporting removable immigrants in the United States.

19.     Defendant Matthew T. Albence is the Acting Director of ICE. He is responsible for developing, promulgating, implementing, and overseeing ICE's policies and practices. He is sued in his official capacity.

20.     Defendant U.S. Department of Justice ("DOJ") is a federal cabinet department and the chief law enforcement agency of the United States. DOJ is charged, *inter alia*, with overseeing and making policy for the Executive Office for Immigration Review (EOIR).

21.     Defendant William P. Barr is the Attorney General of the United States. He is responsible for developing, promulgating, implementing, and overseeing the policies and practices of DOJ and its component agencies, including EOIR. He is sued in his official capacity.

22.     Defendant Executive Office for Immigration Review ("EOIR") is a component agency of DOJ. EOIR is responsible for adjudicating immigration cases at the trial and appellate levels. EOIR oversees the Board of Immigration Appeals ("BIA"), the administrative body that decides appeals in immigration cases, and the Office of the Chief Immigration Judge, which oversees the nation's trial-level immigration courts.

23.     Defendant James McHenry is the Director of EOIR. He is responsible for overseeing immigration proceedings and developing, promulgating, implementing, and overseeing EOIR's policies and practices. He is sued in his official capacity.

## ALLEGATIONS

**I.      Connecticut's Individualized and Discretionary System for Granting Executive Pardons**

24.     Like the power to punish, the power to pardon is typical of, and inherent in, the sovereign power that each state retained when it joined the Union.

25.     Each of the 50 states has a mechanism for considering pardon applications from people convicted of committing criminal offenses. But while all states pardon, they do not all pardon in the same way. Instead, each state has exercised its sovereign prerogative to develop and implement its own system for evaluating and granting pardon applications.

26.     Defendants themselves have long recognized that each state has the exclusive prerogative, in our federal system, to structure its own pardon processes: "[W]hether a state opts to authorize the granting of a pardon, and by what mechanism, for which offenses, and under what circumstances, are matters resting within the sovereign decision-making powers of that state." *Matter of Nolan*, 19 I&N Dec. 539, 544 (BIA 1988).

27.     Under Connecticut's chosen pardon system, which has been in place since 1883, the state's sovereign power to pardon is vested in a Board of Pardons and Paroles established by the state legislature. The Board is an executive branch agency whose members and chairperson are appointed by Connecticut's Governor. Conn. Gen. Stat. § 54-130a; Conn. Gen. Stat. § 54-124a(a)(1).

28.     Connecticut's choice to channel its sovereign pardoning power through an executive-branch board is not unique. Fully 47 states have established a board with at least some influence in the pardon process. In some states, the governor sits on the board. *See, e.g.*, Fla. Stat. ch. 940.01. In others, the governor must consult with the board before issuing a pardon. *See, e.g.*, Alaska Stat. § 33.20.080. In still others, the board serves as a gatekeeper, passing recommendations to the governor. Ariz. Rev. Stat. § 31-402(A). And in six states – Alabama, Connecticut, Georgia, Idaho, South Carolina, and Utah – the governor appoints members of an executive- branch board, which exercises the pardon power of the sovereign state. Ala. Code §§ 15-22-20 *et seq.*; Ga. Code Ann., § 42-9-2; Idaho Code § 20-210; S.C. Code Ann. § 24-21-10; Utah Code Ann. § 77-27-2.

29.     As is generally true in Alabama, Georgia, Idaho, South Carolina, and Utah, Connecticut's Board of Pardons and Paroles wields the exclusive power to pardon. Connecticut's Board does not need to seek approval from, or even to consult with, any other authority, and no other official or entity is authorized to exercise the state's sovereign power to pardon.

30.     In Connecticut, the Board's power to pardon is also entirely discretionary. As the Connecticut Supreme Court has noted, the Board has "unfettered discretion" to grant or deny a pardon. *McLaughlin v. Bronson*, 206 Conn. 267, 271 (Conn. 1988). Connecticut's statutory scheme "imposes no definitions, no criteria and no mandates giving rise to a duty to . . . grant a pardon," and the Board "can deny the requested relief for any constitutionally permissible reason or for no reason at all." *Dumschat v. Board of Pardons*, 452 U.S. 458, 466-67 (1981).

31.    In addition to being exclusive and discretionary, the Board's pardoning power in Connecticut is also individualized. Unlike some other states, Connecticut has no provision for pardons that occur automatically as a matter of law.

32.    That Connecticut's pardons are discretionary does not mean they are issued without standards or careful consideration. Instead, the Board grants pardons, if at all, only after extensive individualized consideration of the facts and circumstances of each case and the merits of each applicant. *See generally* Carlton J. Giles, *The Pardon Process*, Connecticut Board of Pardons and Paroles (2018), https://tinyurl.com/y4qkojw8.

33.    Connecticut's pardon process begins when an eligible applicant fills out and submits an exhaustive 21-page written application with information on family, criminal history, prior applications, educational history, employment, and history of substance abuse and treatment. That application must be supplemented with supporting documents including a state police criminal history report, police reports for arrests resulting in convictions within the last 10 years, probation status forms for each period of probation served, questionnaires completed by three references, and proof of employment.

34.    Written applications and supporting materials are screened by Board staff to determine eligibility and suitability. The Board then solicits victim input and, wherever appropriate, holds a hearing before a three-member panel at which the victim – if they desire – and the applicant have an opportunity to be physically present. In determining whether to grant a pardon, the Board considers all of the information and factors before it, including, but not limited to, the severity of the offense, the impact on the victim, the victim's input, the applicant's criminal history, how much time has passed since the most recent offense, whether the public

interest is served by granting a pardon, the applicant's accomplishments since their most recent offense, work history, subsequent contact with the criminal justice system, character references, and community service.

35.     This process is designed to produce, and does produce, pardons that are granted based on substantive merit, rather than based on the power and influence of applicants. Scholars and policymakers who seek to improve state pardon processes have consistently endorsed schemes that resemble Connecticut's: Careful, individualized, and insulated from politics.[2]

36.     Connecticut's Board of Pardons and Paroles is an important component part of a criminal justice system that has led the nation in promoting second chances, reducing unnecessary incarceration, and improving public safety. If granted, an absolute, full, and unconditional pardon by the Board legally erases the applicant's entire criminal record, including the fact of arrest. Conn. Gen. Stat. § 54-142a(e)(3). These pardons allow Connecticut residents to rebuild their lives, access educational and economic opportunity, and avoid a damaging cycle of recidivism. From 2016-2018, the Board granted 2,256 pardons – a number that far exceeds the

---

[2] *See, e.g.,* Mindy Fetterman, *Move Is on to Make End-of-Year Pardons Less Random*, Pew Charitable Trusts (Jan. 6, 2016), https://tinyurl.com/y56sw6wo (noting the importance of a "fair and structured process" over a "random" political calculation).

relatively infrequent pardons granted by many far larger states.[3] And, at the same time,

Connecticut's crime rate, arrests, and prison populations all fell significantly.[4]

II.     **The Pardon Waiver Clause Mandates Relief from Removal for Noncitizens Who Receive Executive, Discretionary and Individualized Pardons – Exactly Like, and Including, Connecticut's Pardons**

37.     Connecticut's pardons are exactly the type of pardons that the federal government is mandated to respect under the Pardon Waiver Clause.

38.     The INA allows removal of noncitizens who have been convicted of committing any of a series of enumerated offenses, including "crimes of moral turpitude." 8 U.S.C. § 1227(a)(2)(A)(i).

39.     But Congress, with an appreciation for the value of second chances in appropriate circumstances, did not make conviction the end of the story for all noncitizens. Instead, the INA's Pardon Waiver Clause, 8 U.S.C. § 1227(a)(2)(A)(vi), provides that a non-citizen who would otherwise be subject to removal for conviction of an enumerated offense is entitled to a waiver of removal if he or she "has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States."

---

[3] Connecticut Board of Pardons and Paroles, *Pardons Calendar Year Statistics*, https://portal.ct.gov/BOPP/Research-and-Development-Division/Statistics/Statistics. Thus, for instance, Connecticut, with a population of 3.573 million, granted 767 pardons in 2018. Florida, with a population of 21.3 million, typically grants fewer than 100 full pardons each year. Restoration of Rights Project, *Characteristics of Pardon Authorities* (Dec. 2018), https://tinyurl.com/y5qyk6du.

[4] Kelan Lyons, *Connecticut's Crime Rate, Arrests, Probation and Prison Populations All Down*, The Connecticut Mirror (Oct. 1, 2019), https://ctmirror.org/2019/10/01/connecticuts-crime-rate-arrests-probation-and-prison-populations-all-down/.

40.     The Pardon Waiver Clause has never been understood to mean that only a pardon issued directly by a governor herself, without an intermediary, gives rise to a mandatory waiver of removal. Even today, Defendants have apparently not advanced the claim that the Clause's benefits must be withheld from any noncitizen who receives a pardon from any state executive-branch entity other than a governor.

41.     Instead, since it first became law, the Pardon Waiver Clause has consistently been accorded the settled and correct meaning that Congress intended: Federal agencies must waive removal when a noncitizen receives a pardon that is functionally executive, in the sense of being individualized and discretionary, even if issued by a pardoning authority other than the Governor. Meanwhile, generic legislative pardons – granted automatically by operation of law – do not protect against removal.

42.     The history of the Pardon Waiver Clause proves the point. Prior to the passage of the INA in 1952, Section 19 of the Immigration Act of 1917 provided simply that a noncitizen "who has been pardoned" could not be removed for conviction of a crime of moral turpitude. 8 U.S.C. § 155 (1917).

43.     Because the pardon waiver language in the Immigration Act of 1917 was unqualified, it was understood to bar removal regardless of the nature of the pardon. Thus, in *Perkins v. U.S. ex rel. Malesevic*, 99 F.2d 255 (3rd Cir. 1938), the Third Circuit held that a noncitizen who was convicted of a crime of moral turpitude, but who received an automatic pardon under Pennsylvania law – that is, a pardon that was effectuated by operation of law and extended to every member of a predefined class, regardless of individualized circumstances – was not subject to removal.

12

44.     When it adopted the INA and added language to the Pardon Waiver Clause requiring a full and unconditional pardon "by the President of the United States or the governor of any of the states," Congress was aware of, and spoke directly to limit the efficacy of, automatic pardons such as one in *Perkins*. The Senate Judiciary Committee even had a name for these pardons that happened by operation of law: "[T]here exist so-called *legislative pardons* under which an alien is pardoned by operation of law in several States after completion of his sentence."[5]

45.     The new language had its intended effect. Thus, in *Matter of R-*, 5 I&N Dec. 612, 619 (BIA 1954), Defendants' Board of Immigration Appeals held that after the adoption of the INA, the same Pennsylvania automatic pardon statute at issue in *Perkins* no longer gave rise to a waiver of removal. As the BIA explained: "By limiting the benefit [of the Pardon Waiver Clause] to presidential and gubernatorial pardons only, Congress has manifested an express intention to grant exemptions from deportation only to those aliens who have obtained an executive pardon. We therefore conclude that a legislative pardon, such as that obtained by the respondent, is ineffective to prevent deportation."

46.     The terminology and distinction noted by the Senate and highlighted by the BIA just two years after the INA's passage would become dispositive of the settled meaning of the statute over the next 60-plus years. "Executive pardons" – pardons characterized by individualized discretion and consideration – give rise to relief under the Pardon Waiver Clause. "Legislative pardons" – pardons that automatically take effect by operation of law – do not.

---

[5] S. Rep. No. 1515, at 637 (81st Cong., 2d Sess. 1950) (emphasis added).

47.     Critically, the terms "legislative" and "executive" have not been understood to refer to the source of state authority for the pardon. To Plaintiff's knowledge, until 2018, Defendants never pretended that the dispositive question was whether a state's system for granting pardons was authorized by state statute or a state constitution.

48.     Thus, in *Matter of Nolan*, 19 I&N Dec. 539 (BIA 1988), the BIA held that a pardon granted automatically by the Louisiana constitution to first time felons did not satisfy the Pardon Waiver Clause: "This type of pardon, although provided for under a state constitution rather than by statute, is akin to the legislative pardon which Congress clearly rejected when it enacted the current pardon provision of the Act in 1952." *Id.* at 544.

49.     *Nolan* highlights the functional test that Defendants consistently applied in building their settled practice. A pardon is legislative and thus ineffective under the Clause if it works in the way that legislation typically works: by defining a class of eligible applicants and granting relief automatically and across the board to everyone in the class. By contrast, a pardon is executive, and therefore effective under the Clause, if it works in the way that executive action typically works: discretionarily, based on individualized facts.

50.     It follows from the functional nature of the legislative/executive distinction that (at least until Defendants' recent reversal) it never mattered to the settled meaning of the Pardon Waiver Clause whether an executive pardon was granted directly by a governor or instead by another executive-branch official making a discretionary and individualized determination. As the BIA put it in *Nolan*: "The supreme pardoning power may rest with an executive or executive body other than the President of the United States or the Governor of a state." *Id. at* 542.

51.     Thus, in a long and consistent string of BIA decisions, Defendants embraced a clear policy of honoring pardons issued by executive officials other than state governor: A city mayor, *Matter of C-R-*, 8 I&N Dec. 59, 61 (BIA 1958); the appointed territorial governor of Hawaii, *Matter of T-*, 6 I&N Dec. 214 (BIA 1954); and the federally-appointed U.S. High Commissioner for Germany. *Matter of K-*, 9 I&N Dec. 336 (BIA 1961).

52.     Defendants have a settled history of respecting the efficacy of "executive" pardons issued by state pardon boards that work just like Connecticut's. Pardons issued by Georgia's Board of Pardons and Paroles – an executive branch agency whose members are appointed by the state's governor, just as in Connecticut – have always been, and it appears continue to be, respected by Defendants. *See, e.g.*, *Matter of Tajer*, 15 I&N Dec. 125 (BIA 1974) (recognizing the efficacy under the Clause of pardons granted by the Georgia State Board of Pardons and Paroles). And, on information and belief, Defendants have continued to respect and accord full weight and efficacy to the pardons issued by the other four states with pardon schemes functionally identical in all relevant ways to Connecticut – Alabama, Idaho, Utah, and South Carolina.

53.     In fact, Defendants have even acknowledged – until their recent *sub silentio* reversal – that Connecticut's own pardons give rise to removal waivers under the Clause. In *Ainsleton Murphy*, A037 214 467 (BIA April 16, 2002), Defendants' Board of Immigration Appeals relied on the well-settled functional legislative/executive test to rule that a Connecticut pardon compels a waiver of removal, since Connecticut's Board – as an executive-branch agency that wields the sovereign state's individualized and discretionary pardoning power – satisfies the requirements of the Pardon Waiver Clause.

15

III.   **In 2018, Without Explaining or Even Acknowledging the Change, Defendants Reversed Their Settled Practice and Began to Deny the Efficacy of Connecticut Pardons**

54.    In or about late March of 2019, Plaintiff became aware that Defendants had reversed course *sub silentio* and initiated their current pattern and practice of denying the efficacy of Connecticut's pardons under the Clause.

55.    To Plaintiffs' knowledge, the first agency action reversing course came in the case of Richard Marvin Thompson, a lawful permanent resident who was convicted as a young man of a second-degree assault after a bar fight. On December 13, 2017, Mr. Thompson received a full, complete, absolute, and unconditional pardon from Connecticut's Board of Pardons and Paroles. Rather than respecting and recognizing that pardon and affording Mr. Thompson the relief from removal that he was entitled to, ICE detained Mr. Thompson and attempted to remove him. And on August 7, 2018, 66 years after the INA enacted protections for noncitizens like Mr. Thompson who received "executive" pardons, Defendants' Board of Immigration Appeals simply redefined his rights out of existence without acknowledging that it was departing from its own settled course.

56.    In *In re Richard Marvin Thompson*, A045 882 854 (BIA Aug. 7, 2018) (Attachment 1 to this Complaint), the BIA decided that Connecticut pardons are not "effective for purposes of establishing entitlement" to a waiver of removal. In place of the settled functional test that distinguished executive and legislative pardons, the BIA invented a new and bizarre test with no basis in historical practice, law, or logic. Now, the BIA arbitrarily decreed, a pardon must either be granted by a governor directly or else by an executive-branch body that is set up by the state constitution. Of course, Connecticut's pardons are neither: As they had been since

16

the INA was passed in 1952, they are granted by an executive-branch board established by statute, whose members are appointed by the Governor.

57.    In inventing its new rule, the BIA admitted that "we have long recognized that in some states, the supreme pardoning power of the state may rest with some other executive body" rather than the governor. *Id.* Even this minimal admission, though, badly misstated Defendants' own history of settled practice. On information and belief, Defendants had recognized the power in not just "some" but in *every* state where it was exercised, and in territories, foreign countries, and cities to boot. And, before their *sub silentio* reversal, Defendants even recognized the efficacy of pardons granted in *this* state, Connecticut.

58.    There is nothing in the INA's text or legislative history mandating – or even remotely hinting – that a state's executive pardon authority must stem from the state's constitution in order to have effect under the Pardon Waiver Clause.

59.    In inventing a new test to exclude Connecticut residents from the benefit of state pardons, the BIA failed to acknowledge that it had specifically rejected the exact same test in *Matter of Nolan*, 19 I&N Dec. 539 (BIA 1988), when it held that a functionally legislative (i.e., automatic) pardon was invalid under the Clause even though it derived from the state constitution. The BIA never confronted the implications of a federal agency's intruding into a core issue of sovereignty by purporting to dictate not only what pardon laws a sovereign state must pass in order to receive a federal benefit but also exactly how the state must enact those laws. The BIA apparently never considered the Equal Protection implications of treating Mr. Thompson differently than a similarly situated person in Georgia. And it certainly never sought input from the state of Connecticut, whose sovereign rights and prerogatives were at stake.

60.     As far as Plaintiffs are aware, the next action in Defendants' pattern and practice was taken in the case of Wayzaro Walton, who came to the United States at the age of 3. Ms. Walton, a lawful permanent resident who married a U.S. citizen and gave birth to a U.S. citizen daughter, was convicted of larcenies in Connecticut, with the last offense occurring in 2011. And on January 15, 2019, Ms. Walton received a full, complete, absolute, and unconditional pardon from Connecticut's Board of Pardons and Paroles. But as of this filing, Ms. Walton is detained in the custody of Defendant ICE, awaiting removal for conviction of offenses that have been wiped clean from her record by Connecticut's executive pardon.

61.     When Connecticut's governor protested, in a letter to Defendant DHS, against this disregard for Connecticut's sovereign pardoning power, Defendant USCIS sent a letter (Attachment 2 to this Complaint) that merely reiterated the bad reasoning articulated in the BIA's *Thompson* decision. The USCIS letter failed, once again, to recognize that Defendants had made a 180-degree turn or provide any rational explanation for Defendants' reversal.

62.     Defendant DOJ was also pressed to explain Defendants' pattern and practice of singling-out Connecticut pardons. In a letter (Attachment 3 to this Complaint), Defendant DOJ's Civil Division, Office of Immigration Litigation ("OIL") conceded that Connecticut is one of six states that vest the pardoning power in an executive-branch board. But OIL suggested that Connecticut is "unique" – and, it seems, in Defendants' minds, should be treated differently than other states – because it is purportedly the only state where "the underlying authority listed for the independent board derives not from a state constitutional provision, but from a state statute."

63.     This distinction, to the extent it is intended to justify a policy or practice of Defendants, is arbitrary, capricious, and contrary to law for all the reasons explained above. It is

18

also factually wrong. Connecticut is not the only state that created an executive-branch board, and vested the pardon power in that board, via statute. The Alabama legislature, not the state constitution – which nowhere mentions anything about a pardons board – created that state's pardons board. And yet it appears that the federal government continues to honor Alabama's pardoning power.

64.    The OIL Letter is correct in one sense, though: Connecticut is indeed unique. It is the only state, among 50 sovereign states, singled out by Defendants for unequal and prejudicial treatment. That unjustified targeting of Connecticut and its residents is illegal and unconstitutional.

## CLAIMS FOR RELIEF

I.    **First Claim for Relief: Violation of the Administrative Procedure Act – Not in Accordance with Law**

65.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

66.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

67.    Defendants' practice of refusing to waive removal for recipients of Connecticut's pardons conflicts with the clear and well-established meaning of the Immigration and Nationality Act's Pardon Waiver Clause, 8 U.S.C. § 1227(a)(2)(A)(vi).

68.    Since it was first written into law in 1952 and until very recently, the Pardon Waiver Clause had a settled meaning. It mandates waiver of removal whenever a noncitizen receives a discretionary and individualized pardon – an "executive" pardon – from a state's designated pardoning authority. Connecticut's pardons are just such pardons: They are issued,

after individualized consideration and review, by an executive-branch agency appointed by Connecticut's governor.

69.     Now, Defendants have a pattern and practice of rejecting Connecticut's pardons because they were not granted pursuant to a process spelled out in the state constitution. But that requirement is not found in the text or the legislative history of the INA and is contrary to the settled meaning of the statute.

70.     Because they adopted and implemented a pattern and practice in contravention of the correct and settled meaning of the INA, Defendants' conduct is "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A). The violation causes ongoing harm to Plaintiff and its residents.

**II.     Second Claim for Relief: Violation of the Administrative Procedure Act – Arbitrary and Capricious**

71.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

72.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

73.     Defendants' actions are arbitrary and capricious because they run counter to the evidence before Defendants about the legislative history and intent of the Clause; ignore and depart from a long history of settled practice without explaining or even acknowledging the departure; rely on factors – including a test based on the state constitutional origin of the pardoning power that the BIA invented out of whole cloth – that Congress did not intend Defendants to consider; disregard material facts and evidence, including the existence of other states whose practices are functionally identical in all relevant ways to those of Connecticut; and

20

fail to consider the discriminatory impact of their actions and the related costs to Connecticut and its residents, including the constitutional implications of the Tenth Amendment and equal sovereignty violations.

74.     To justify their abrupt reversal, Defendants have created a fragmentary and utterly inadequate record consisting of three documents: A poorly-reasoned BIA decision that reverses settled practice *sub silentio* and creates out of whole cloth a new test that the BIA itself had previously rejected (Attachment 1); a USCIS letter that merely quotes, but fails to explain, the BIA's decision (Attachment 2); and a DOJ letter (Attachment 3) that proposes an irrelevant distinction and makes a critical mistake of fact.

75.     Defendants' conduct is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A). The violation causes ongoing harm to Plaintiff and its residents.

### III.     Third Claim for Relief: Violation of the Tenth Amendment to the United States Constitution

76.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

77.     The Tenth Amendment to the United States Constitution provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Although the States surrendered many of their powers to the Federal Government when they adopted the Constitution, "they retained 'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 919 (1997) (*citing* The Federalist No. 39, at 245 (J. Madison). That sovereignty includes the States' power to organize their own governmental structure. "Through the structure

of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

78.     It was perhaps Defendants themselves who best explained that a state's choice about how to exercise its pardoning power is integral to its sovereignty: "[W]hether a state opts to authorize the granting of a pardon, and by what mechanism, for which offenses, and under what circumstances, are matters resting within the sovereign decision-making powers of that state." *Matter of Nolan*, 19 I&N Dec. 539, 544 (BIA 1988).

79.     Defendants' pattern and practice of disregarding Connecticut's pardons purports to condition eligibility for a federal benefit on whether Connecticut has structured its pardoning power in a way that pleases Defendants. Of course, that position runs counter to the INA's functional test. It also violates the Tenth Amendment, because it impermissibly intrudes into Connecticut's sovereign power to structure its own government.

80.     Defendants seek to dictate not just the *content* of Connecticut law but the *processes* and *mechanisms* by which Connecticut makes its law. Indeed, by declaring that the state cannot secure the benefits of the Pardon Waiver Clause through a statutory pardon mechanism, Defendants would effectively force the Constitution State to rewrite its Constitution.

81.     Defendants also purport to be able to identity specifically which executive-branch official must implement Connecticut's pardon power. That is a bridge too far: The federal government simply does not have the authority to either dictate the content of legislation passed by a state or to commandeer and supervise the state's executive officers,

such as by ordering a specific officer to be the conduit for pardons. *See New York v. United States*, 505 U.S. 144 (1992).

82.     Defendants' conduct therefore violates the Tenth Amendment to the United States Constitution. The violation causes ongoing harm to Plaintiff and its residents.

**IV.    Fourth Claim for Relief: Violation of the Constitutional Right to Equal Sovereignty**

83.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

84.     The Supreme Court has taught that the Constitution protects each state's right to equal sovereignty with its sister states. *See Shelby County v. Holder*, 570 U.S. 529, 544 (2013) ("Not only do States retain sovereignty under the Constitution, there is also a fundamental principle of equal sovereignty among the States.") (internal quotation marks omitted). The Supreme Court taught in *Shelby County* that the federal government must make a showing of "current need" if it intends to impose disparate treatment among the states and their laws, departing from the principle of "constitutional equality of the States" that "is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* at 542.

85.     Here, Defendants have not even attempted to make any showing of need for engaging in a pattern and practice of treating Connecticut's pardon system -- and its residents who receive pardons -- differently from those of any other state, even those five other states whose systems are structurally identical to Connecticut's.

86.     Congress did not intend, by the Pardon Waiver Clause, to randomly select winners and losers from among the states, and the Constitution does not allow it. Defendants'

conduct therefore violates Plaintiff's constitutional right to equal sovereignty. The violation causes ongoing harm to Plaintiff and its residents.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.      Declare that Defendants' practice of disregarding the efficacy and impact of Connecticut's pardons is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2.      Declare that Defendants' practice is unconstitutional under the Tenth Amendment and the constitutional principle of equal sovereignty;

3.      Hold unlawful, vacate, and set aside Defendants' practice of disregarding the efficacy and impact of Connecticut's pardons under the Pardon Waiver Clause;

4.      Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever that discriminates against Connecticut residents under the Pardon Waiver Clause;

5.      Order Defendants and all of their officers, employees, and agents, and anyone acting in concert with them, to grant the recipients of full and unconditional pardons from Connecticut's Board of Pardons and Paroles all of the benefits to which any recipient of a pardon by "the Governor of any of the several States" is entitled under the Pardon Waiver Clause;

6.      Award Plaintiff costs and attorney fees as allowed by law; and

7.      Grant other such relief as this Court may deem proper.

Dated: October 10, 2019                     Respectfully submitted,

                                            WILLIAM TONG
                                            Attorney General
                                            State of Connecticut

                              By:    /s/ Margaret Q. Chapple
                                            MARGARET Q. CHAPPLE (CT # 05550)
                                            Deputy Attorney General
                                            Margaret.chapple@ct.gov

                                            VANESSA ROBERTS AVERY (CT # 21000)
                                            Associate Attorney General
                                            Vanessa.avery@ct.gov

                                            JOSHUA PERRY* (CT # 439166)
                                            Special Counsel for Civil Rights

                                            55 Elm Street
                                            Hartford, CT 06106-0120
                                            (860) 808-5318
                                            Joshua.perry@ct.gov

                                            *Attorneys for Plaintiff State of Connecticut*

                                            *Admission to D. Conn. pending