## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **STATE OF CONNECTICUT** | |
| *Plaintiff*, | |
| **v.** | **No.3:19-cv-01597-VLB** |
| **U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD WOLF, in his official capacity as Acting Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF STATE; and MICHAEL R. POMPEO, in his official capacity as Secretary of State.** | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants*. | |

## <u>INTRODUCTION</u>

1.      Defendants are federal agencies and officers responsible for shaping and implementing immigration policy. In 2017, they abruptly abandoned decades of settled practice and began denying immigration benefits to people who receive pardons from the State of Connecticut. Now, the State files this civil action to protect its sovereign rights and interests and the constitutional rights and interests of its residents, who are entitled to the same immigration benefits as the residents of the other 49 states.

2.      Connecticut pardons are critically important to immigrant recipients and to the State itself. The Pardon Waiver Clause ("Clause") of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(vi), provides protection against arrest, detention, and removal for noncitizens who have earned second chances. Ordinarily, noncitizens who are convicted of a "crime of moral

turpitude" may be subject to removal. But under the Clause, noncitizens cannot be removed if they have "been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States."

3.      State pardons can also make all the difference between admissibility and inadmissibility. Under 8 U.S.C. §1182, a noncitizen may be inadmissible to the United States for conviction of a crime of moral turpitude. But there is an exception where "a full and unconditional pardon has been granted by the President of the United States [or] by the Governor of a State of the United States." 22 CFR § 40.21(a)(5).

4.      On information and belief, for 65 years – from the time of the passage of the INA in 1952 until 2017 – the federal government afforded Connecticut's pardons the same respect afforded to discretionary pardons granted by executive agencies in the other 49 states. When a noncitizen received a pardon from Connecticut's Board of Pardons and Paroles, the federal government would desist from arresting and detaining, removing, and barring that person from admission on grounds of conviction of a crime of moral turpitude.

5.      Throughout those decades, the State and its residents – citizens and noncitizens alike – benefitted when immigrants who earned pardons were able to enter the country; remain here in Connecticut; live with and support their families; pay taxes; and strengthen the State's communities and economy.

6.      In or about 2017, however, Defendants sharply broke from settled practice and adopted a policy and practice of refusing to recognize and credit

Connecticut pardons. Based on a novel, illogical, and unsupported reading of Connecticut's pardon process, Defendants began incorrectly insisting that Connecticut's pardon system was somehow unique, and uniquely disfavored. Defendants arrogated to themselves the power to arrest and detain a noncitizen for commission of a crime, or to deny admission, even if the noncitizen had earned a full and unconditional Connecticut pardon.

7.      Five other states have pardon systems that are functionally identical to Connecticut's system, with pardons awarded by a gubernatorially-appointed board. On information and belief, the federal government continues to give full immigration benefits to recipients of those states' pardons. In fact, on information and belief, Defendants respect and credit the pardons of every state in the nation except those issued in Connecticut.

8.      Defendants continue to implement their policy and practice of arresting, detaining, and refusing to admit immigrants who have received Connecticut pardons. Connecticut has sought to defend itself and its residents when it has become aware of individual instances, as an amicus in immigration proceedings. But, as a judge of the federal Court of Appeals for the Second Circuit has noted, the recurrent nature of the problem and the ongoing threat posed by Defendants' policy and practice defies individual, reactive requests for relief. *See* Audio Recording of Oral Argument at minute 12:30, *In re Wayzaro Walton*, 19-789 (2nd Cir. Sept. 3, 2019) (Carney, J.) ("Has the State considered taking a declaratory judgment action?").

9.      By disregarding Connecticut's pardons, Defendants violate Connecticut's prerogative, protected by the Tenth Amendment, to structure and exercise its sovereign pardoning power. By irrationally singling Connecticut out from among its 49 sister states without any showing of need, Defendants violate the constitutional principle of equal sovereignty. And by reversing course abruptly and departing without reasoned explanation from a settled policy and practice that is mandated by the history, intent, and logic of the INA, Defendants violate the Administrative Procedure Act's (APA) prohibitions against agency actions that are arbitrary, capricious, not in accordance with law, and contrary to constitutional right.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Administrative Procedure Act, 5 U.S.C. § 706, and the Tenth Amendment of the U.S. Constitution. Declaratory relief is authorized under 28 U.S.C. § 2201.

11.      Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §§ 1391(b) and (e)(1). Defendants are United States agencies or officers sued in their official capacities; Plaintiff, the State of Connecticut, is a resident of this judicial district; and a substantial part of the events or omissions giving rise to this action occurred and are continuing to occur in this district.

## PARTIES

**Plaintiff State of Connecticut**

12.     The State of Connecticut, represented by its Attorney General, William Tong, is a sovereign state of the United States of America. The Attorney General is Connecticut's chief legal officer, with supervision over civil legal matters in which the State is an interested party. Conn. Gen. Stat. § 3-125. Ned Lamont, the Governor of the State of Connecticut, has endorsed the Attorney General's bringing this action.

13.     Connecticut brings this suit to vindicate its sovereign interests in promoting the integrity and efficacy of its laws and government structures, in protecting its core structures of state government against federal commandeering and coercion, and in preserving its equal sovereignty alongside its sister states.

14.     Connecticut also brings this suit to vindicate its quasi-sovereign interest in promoting and protecting the health, safety, and well-being of its residents. Defendants' actions harm resident noncitizens, who are excluded and threatened with arrest and detention because of Defendants' actions. Defendants' actions fracture and harm noncitizens' families and communities. And Defendants' actions harm Connecticut's entire economy, which suffers when residents are wrongfully arrested, detained, and denied entry.

15.     Finally, Connecticut seeks to protect its proprietary interests. Defendants' practices impose real administrative costs on Connecticut's state government, which absent intervention by this Court will be forced to restructure its pardon system, and even rewrite its state constitution, if it wishes to offer deserving noncitizens the full benefits of a second chance. If Connecticut does

not bend to Defendants' whim and restructure its pardon system, it will suffer the costs of wrongful arrest and detention to its residents. Those costs include reduced tax payments received from noncitizen residents and increased social support benefits that the State will be forced to pay to some families that have been robbed of their breadwinners by Defendants' actions.

16.    Defendants' actions harm hundreds of Connecticut residents, and through them the State of Connecticut. Defendants, not the State of Connecticut, hold records pertaining to the arrest, detention, and inadmissibility determinations of Connecticut residents. Only discovery can fully reveal the scale of the harm caused by Defendants' actions. What Connecticut knows is that, in recent years, the State's Board of Pardons and Paroles has awarded an average of about 750 full and unconditional pardons every year, and more than 6% of pardon applicants are non-citizens. Over the course of a decade, at that rate, Connecticut expects to award pardons to 450 non-citizens – and, for each of them, and for their families, communities, and the State, the pardon may have dramatic and life-changing immigration consequences.

17.    The State of Connecticut depends on the economic contributions of immigrants. Immigrant residents earn $23.5 billion and spend $16.1 billion annually; employ 95,177 people; comprise 23.4% of the science, technology, education and math workforce; and pay $7.4 billion in state and local taxes.[1] When those immigrants are wrongly arrested, detained, removed, or excluded

_____

[1] **New American Economy,** *Immigrants and the Economy in Connecticut*, https://tinyurl.com/t72bezt.

from the country, Connecticut suffers direct and adverse economic and fiscal consequences. Residents who are wrongfully held in detention, or who are wrongfully kept outside the country, cannot work, pay taxes, or support their families. Instead, the State must often step in to expend public funds sustaining their families.

18.    Connecticut invests considerable resources in its pardons process, budgeting $6,567,994 for its Board of Pardons and Paroles in state fiscal year 2020 and $6,927,233 in state fiscal year 2021. Those funds support the State's careful pardon process, implemented by both professional staff and gubernatorially-appointed board members, which is built on nationally accepted best practices.

19.    Connecticut invests in the pardon process in order to secure, for itself and for its residents, the full range of benefits that come when rehabilitated ex-offenders earn and are afforded a real opportunity for a second chance. But Defendants' actions diminish the value of Connecticut's past, present, and future investments in a meaningful pardon process.

**Defendants**

20.    Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet department charged, *inter alia*, with administering and enforcing federal immigration law. The work of DHS and its component agencies includes processing and adjudicating applications for citizenship and lawful immigration status; enforcing federal immigration law by arresting, detaining, prosecuting, and deporting removable immigrants; and control and management of the United

States' borders, including determining which applicants may enter the country's land borders.

21.     Defendant Chad Wolf is Acting Secretary of DHS. He is responsible for developing, promulgating, implementing, and overseeing the policies and practices of DHS and its component agencies. He is sued in his official capacity.

22.     Defendant U.S. Department of State ("DOS") is a federal cabinet department charged, *inter alia*, with issuing visas and regulating reentry into the country by non-citizens who travel overseas.

23.     Defendant Michael R. Pompeo is the Secretary of State. He is responsible for developing, promulgating, implementing, and overseeing the policies and practices of DOS and its component agencies. He is sued in his official capacity.

## ALLEGATIONS

### A. Connecticut's Individualized and Discretionary System for Granting Executive Pardons

24.     Like the power to punish, the power to pardon is inherent in the sovereign power that each state retained when it joined the Union.

25.     Every state has a mechanism for considering pardon applications from people convicted of criminal offenses. But while all states pardon, they do not all pardon in the same way. Instead, each state has exercised its sovereign prerogative to develop and implement its own system for evaluating and granting pardon applications.

26.     Each state has the exclusive prerogative, in our federal system, to structure its own pardon processes. As the Board of Immigration Appeals has

recognized: "[W]hether a state opts to authorize the granting of a pardon, and by what mechanism, for which offenses, and under what circumstances, are matters resting within the sovereign decision-making powers of that state." *Matter of Nolan*, 19 I&N Dec. 539, 544 (BIA 1988).

27.     Under Connecticut's chosen pardon system, which has been in place since 1883, the state's sovereign power to pardon is vested in a Board of Pardons and Paroles established by the state legislature. The Board is an executive branch agency whose members and chairperson are appointed by Connecticut's Governor. Conn. Gen. Stat. § 54-130a; Conn. Gen. Stat. § 54- 124a(a)(1).

28.     Connecticut's choice to channel its sovereign pardoning power through an executive-branch board is not unique. Fully 47 states have established a board with at least some role in the pardon process. In some states, the governor sits on the board. *See, e.g.*, Fla. Stat. ch. 940.01. In others, the governor must consult with the board before issuing a pardon. *See, e.g.*, Alaska Stat. § 33.20.080. In still others, the board serves as a gatekeeper, passing recommendations to the governor. Ariz. Rev. Stat. § 31-402(A). And in six states – Alabama, Connecticut, Georgia, Idaho, South Carolina, and Utah – the governor appoints members of an executive- branch board, which exercises the pardon power of the sovereign state. Ala. Code §§ 15-22-20 *et seq.*; Ga. Code Ann., § 42-9-2; Idaho Code § 20-210; S.C. Code Ann. § 24-21-10; Utah Code Ann. § 77-27-2.

29.     As is generally true in Alabama, Georgia, Idaho, South Carolina, and Utah, Connecticut's Board of Pardons and Paroles wields the exclusive power to pardon. Connecticut's Board does not seek approval from, or even consult with,

any other authority, and no other official or entity is authorized to exercise the state's sovereign power to pardon.

30.     In Connecticut, the Board's power to pardon is entirely discretionary. As the Connecticut Supreme Court has noted, the Board has "unfettered discretion" to grant or deny a pardon. *McLaughlin v. Bronson*, 206 Conn. 267, 271 (Conn. 1988). Connecticut's statutory scheme "imposes no definitions, no criteria and no mandates giving rise to a duty to . . . grant a pardon," and the Board "can deny the requested relief for any constitutionally permissible reason or for no reason at all." *Dumschat v. Board of Pardons*, 452 U.S. 458, 466-67 (1981).

31.     In addition to being exclusive and discretionary, the Board's pardoning power in Connecticut is also individualized. Connecticut has no provision for pardons that occur automatically as a matter of law.

32.     That Connecticut's pardons are discretionary and individualized does not mean they are issued without standards or careful consideration. Instead, the Board grants pardons, if at all, only after extensive consideration of the facts and circumstances of each case and the merits of each applicant.[2]

33.      Connecticut's pardon process begins when an eligible applicant fills out and submits an exhaustive 21-page written application with information on family, criminal history, prior applications, educational history, employment, and history of substance abuse and treatment. That application must be supplemented with supporting documents including a state police criminal

---

[2] *See generally* Carlton J. Giles, *The Pardon Process*, Connecticut Board of Pardons and Paroles (2018), https://tinyurl.com/y4qkojw8.

history report, police reports for arrests resulting in convictions within the last 10 years, probation status forms for each period of probation served, questionnaires completed by three references, and proof of employment.

34.     Written applications and supporting materials are screened by Board staff to determine eligibility and suitability. The Board then solicits victim input and, wherever appropriate, holds a hearing before a three-member panel at which the victim – if they desire – and the applicant have an opportunity to be physically present. In determining whether to grant a pardon, the Board considers all of the information and factors before it, including, but not limited to, the severity of the offense, the impact on the victim, the victim's input, the applicant's criminal history, how much time has passed since the most recent offense, whether the public interest is served by granting a pardon, the applicant's accomplishments since their most recent offense, work history, subsequent contact with the criminal justice system, character references, and community service.

35.     This process is designed to produce, and does produce, pardons that are granted on the basis of substantive merit, rather than the power and influence of applicants. Scholars and policymakers who seek to improve state pardon processes have consistently endorsed schemes that resemble Connecticut's: Careful, individualized, and insulated from politics.[3]

---

[3] *See, e.g.,* Mindy Fetterman, *Move Is on to Make End-of-Year Pardons Less Random*, Pew Charitable Trusts (Jan. 6, 2016), https://tinyurl.com/y56sw6wo (noting the importance of a "fair and structured process" over a "random" political calculation).

36.     Connecticut's Board of Pardons and Paroles is an important part of a criminal justice system that has led the nation in promoting second chances, reducing unnecessary incarceration, and improving public safety. If granted, an absolute, full, and unconditional pardon by the Board legally erases the applicant's entire criminal record, including the fact of arrest. Conn. Gen. Stat. § 54-142a(e)(3). These pardons allow Connecticut residents to rebuild their lives, access educational and economic opportunity, and help avoid a damaging cycle of recidivism.

37.     From 2016-2018, the Board granted 2,256 pardons – a number that far exceeds the relatively infrequent pardons granted by many far larger states.[4] And, at the same time, Connecticut's crime rate, arrests, and prison populations all fell significantly.[5]

**B. The INA's Pardon Waiver Clause Mandates Relief from Arrest, Detention, and Removal for Noncitizens Who Receive Connecticut Pardons**

38.     Connecticut's individualized and discretionary pardons are exactly the type of pardons that the federal government must respect, and to whose

---

[4] **Connecticut Board of Pardons and Paroles,** *Pardons Calendar Year Statistics*, **https://portal.ct.gov/BOPP/Research-and-Development-Division/Statistics/Statistics. Thus, for instance, Connecticut, with a population of 3.573 million, granted 767 pardons in 2018. Florida, with a population of 21.3 million, typically grants fewer than 100 full pardons each year. Restoration of Rights Project,** *Characteristics of Pardon Authorities* **(Dec. 2018), https://tinyurl.com/y5qyk6du.**

[5] **Kelan Lyons,** *Connecticut's Crime Rate, Arrests, Probation and Prison Populations All Down*, **The Connecticut Mirror (Oct. 1, 2019), https://ctmirror.org/2019/10/01/connecticuts-crime-rate-arrests-probation-and-prison-populations-all-down/.**

recipients Defendants must grant immigration benefits, under the Pardon Waiver Clause.

39.     The INA allows arrest, detention, and removal of noncitizens who have been convicted of committing any of a series of enumerated offenses, including "crimes of moral turpitude." 8 U.S.C. § 1227(a)(2)(A)(i).

40.     But conviction is not the end of the story. Instead, the INA's Pardon Waiver Clause, 8 U.S.C. § 1227(a)(2)(A)(vi), provides that a noncitizen who would otherwise be subject to arrest, detention, and removal for conviction of an enumerated offense is entitled to a waiver of removal if he or she "has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States."

41.     The Pardon Waiver Clause has never been understood to mean that only a pardon issued directly by a governor herself, without an intermediary, requires waiver of removal. Instead, since it first became law and until the advent of Defendants' new policy and practice, the Pardon Waiver Clause has consistently been accorded the settled and correct meaning that Congress intended: Federal agencies must waive removal when a noncitizen receives a pardon that is functionally executive, in the sense of being individualized and discretionary, even if issued by a pardoning authority other than the Governor. Meanwhile, generic legislative pardons – granted automatically by operation of law – do not protect against removal.

42.     The history of the Pardon Waiver Clause proves the point. Prior to the passage of the INA in 1952, Section 19 of the Immigration Act of 1917

provided simply that a noncitizen "who has been pardoned" could not be removed for conviction of a crime of moral turpitude. 8 U.S.C. § 155 (1917).

43.     Because the pardon waiver language in the Immigration Act of 1917 was unqualified, it was understood to bar removal regardless of the nature of the pardon. Thus, in *Perkins v. U.S. ex rel. Malesevic*, 99 F.2d 255 (3rd Cir. 1938), the Third Circuit held that a noncitizen who was convicted of a crime of moral turpitude, but who received an automatic pardon from the state of Pennsylvania – that is, a pardon that was effectuated by operation of law and extended to every member of a predefined class, regardless of individualized circumstances – was not subject to removal.

44.     When it adopted the INA and added language to the Pardon Waiver Clause requiring a full and unconditional pardon "by the President of the United States or the governor of any of the states," Congress was aware of, and spoke directly to limit the efficacy of, automatic pardons such as the one in *Perkins*. The Senate Judiciary Committee even had a name for these pardons that happened by operation of law: "[T]here exist so-called *legislative pardons* under which an alien is pardoned by operation of law in several States after completion of his sentence."[6]

45.     The new language had its intended effect. Thus, in *Matter of R-*, 5 I&N Dec. 612, 619 (BIA 1954), the Board of Immigration Appeals held that after the adoption of the INA, the same Pennsylvania automatic pardon statute at issue in *Perkins* no longer gave rise to a waiver of removal. As the BIA explained: "By

---

[6] S. Rep. No. 1515, at 637 (81st Cong., 2d Sess. 1950) (emphasis added).

limiting the benefit [of the Pardon Waiver Clause] to presidential and gubernatorial pardons only, Congress has manifested an express intention to grant exemptions from deportation only to those aliens who have obtained an executive pardon. We therefore conclude that a legislative pardon, such as that obtained by the respondent, is ineffective to prevent deportation."

46.     The terminology and distinction noted by the Senate and highlighted by the BIA just two years after the INA's passage would become dispositive of the settled meaning of the statute over the next 60-plus years. "Executive pardons" – pardons characterized by individualized discretion and consideration – give rise to relief under the Pardon Waiver Clause. "Legislative pardons" – pardons that automatically take effect by operation of law – do not.

47.     Critically, the terms "legislative" and "executive" in this context have never been understood to refer to the source of state authority for the pardon. It has never mattered that a state's system for granting pardons is authorized by statute rather than by the state constitution.

48.     Thus, in *Matter of Nolan*, 19 I&N Dec. 539 (BIA 1988), the BIA held that a pardon granted automatically by the Louisiana constitution to first time felons did not satisfy the Pardon Waiver Clause: "This type of pardon, although provided for under a state constitution rather than by statute, is akin to the legislative pardon which Congress clearly rejected when it enacted the current pardon provision of the Act in 1952." *Id.* at 544.

49.     *Nolan* highlights the functional test here. A pardon is legislative and thus ineffective under the Clause if it works in the way that legislation typically

works: by defining a class of eligible applicants and granting relief automatically and across the board to everyone in the class. By contrast, a pardon is executive, and therefore effective under the Clause, if it works in the way that executive action typically works: discretionarily, based on individualized facts.

50.     It follows from the functional nature of the legislative/executive distinction that (at least until Defendants' recent reversal) it never mattered whether an executive pardon was granted directly by a governor or instead by another executive-branch official making a discretionary and individualized determination. As the BIA put it in *Nolan*: "The supreme pardoning power may rest with an executive or executive body other than the President of the United States or the Governor of a state." *Id. at* 542.

51.     Thus, a long and consistent string of BIA decisions mandated that the federal government honor pardons issued by executive officials other than state governor, no matter the source of that executive official's authority to pardon: A city mayor, *Matter of C-R-*, 8 I&N Dec. 59, 61 (BIA 1958); the appointed territorial governor of Hawaii, *Matter of T-*, 6 I&N Dec. 214 (BIA 1954); and the federally-appointed U.S. High Commissioner for Germany. *Matter of K-*, 9 I&N Dec. 336 (BIA 1961).

52.     On information and belief, Defendants' settled practice reflected compliance with those decisions. In fact, in a 2002 decision – which again, on information and belief, Defendants' respected and complied with – the BIA mandated that the federal government grant immigration benefits to recipients of Connecticut's pardons. In *Ainsleton Murphy*, A037 214 467 (BIA April 16, 2002),

the BIA relied on the well-settled functional legislative/executive test to rule that a Connecticut pardon compels a waiver of removal, since Connecticut's Board of Pardons and Parole – as an executive-branch agency that wields the sovereign state's individualized and discretionary pardoning power – satisfies the requirements of the Pardon Waiver Clause.

**C.  Federal Regulations Mandate Relief from Inadmissibility for Noncitizens Who Receive Connecticut Pardons**

53.    In the admissibility context, too, Connecticut's discretionary and individualized pardons are exactly the type of pardons that the federal government is mandated to respect.

54.    The INA denies admission to noncitizens who have been convicted of "crimes of moral turpitude." 8 U.S.C. § 1182(a)(2)(A).

55.    But federal regulations track the INA in establishing a provision, parallel to the Pardon Waiver Clause, providing that a noncitizen who has been convicted of a crime of moral turpitude "shall not be considered ineligible" for admission if they have received "a full and unconditional pardon… by the President of the United States [or] by the Governor of a State." 22 CFR § 40.21(a)(5). By contrast, "[a] legislative pardon… shall not serve to remove a ground of ineligibility." *Id.*

56.    Just as with the Pardon Waiver Clause: The pardon provision of the Code of Federal Regulations has never been understood to mean that *only* a governor can grant a pardon on behalf of a state. Nor has the CFR's "legislative pardon" ever been understood to refer to the source of the authority for the pardon.

57.    For proof, it is not necessary to look further than Defendants' own

Foreign Affairs Manual, which guides Department of State officials in applying the

provisions of the INA and the regulations of the CFR. 9 FAM 302.3-2(B)(3)(h)

provides:

> Generally, pardons that remove an INA 212(a)(2)(A)(i)(I) ineligibility must be
> pardons granted by the highest appropriate executive authority such as the
> President, State Governor, or other person specified in 22 CFR 40.21(a)(5).
> A legislative pardon alone will not remove the ineligibility. A pardon
> granted by a mayor is acceptable if the mayor has been designated as the
> supreme pardoning authority under the relevant municipal ordinances.

58.    According to the DOS' own gloss, then, the benefits of the regulation

are not limited to pardons granted by a state Governor. Instead, residents can

benefit from pardons granted by "the highest appropriate executive authority."

And the pardoning power does not need to be rooted in a state constitution: It

can even be created by a "municipal ordinance," which is surely the creation of a

legislative body.

**D.**   <u>Defendants' New Policy and Practice of Denying Immigration Benefits to
    Recipients of Connecticut's Pardons</u>

59.    In or about 2017, despite the clear law and precedent, Defendants

initiated a new policy and practice of refusing to grant the immigration benefits to

which recipients of Connecticut's individualized, discretionary, executive

pardons are entitled. Connecticut cannot know of every time a Connecticut

pardon recipient was directly harmed by Defendants' actions. But it is aware of a

pattern of actions reflecting both a departure from Defendants' past settled

practices and a new and unlawful policy.

60.     In 2017, Defendant Department of State ("DOS") refused to grant
reentry to Deniz Altinok, a legal permanent resident of Connecticut who had left
the United States to visit family in Turkey. DOS contended that Mr. Altinok was
inadmissible because of conviction for a crime of moral turpitude under 8 U.S.C.
§ 1182. But Mr. Altinok had received a full and unconditional pardon from the
State of Connecticut, which removed his ineligibility to return to the country
under 22 C.F.R. § 40.21.

61.     In excluding Mr. Altinok, Defendants spun out a new and flatly
incorrect reading of the INA and the CFR. While acknowledging that "executive
pardons may be issued other than by the Governor of a State," DOS – in written
correspondence to Connecticut's senior U.S. Senator, Richard Blumenthal –
claimed that Connecticut pardons are invalid because "[t]he Connecticut
Constitution does not expressly grant the authority to grant pardons to any
person or body. Such power is vested in the legislature and is exercised by the
Board of Pardons." This theory, of course, as explained above, is belied by
Defendant DOS' own Foreign Affairs Manual, which recognizes that the pardon
authority's creation by statute (or even ordinance) is irrelevant to the question of
a pardon's validity for immigration purposes. Under clear precedent, a legislative
pardon is a pardon that happens automatically, by operation of statute, not any
pardon that is granted by a body established by statute.

62.     But Defendants persisted, and their persistence continued and
continues to harm Connecticut and its residents.

63.    For instance: Richard Marvin Thompson is a lawful permanent resident of the United States, and a resident of Bridgeport, Connecticut, who was convicted as a young man of a second-degree assault after a bar fight. For this conviction, Mr. Thompson was arrested by Immigration and Customs Enforcement, a component agency of Defendant DHS, and detained pending a threatened removal.

64.    But, on December 13, 2017, Mr. Thompson received a full, complete, absolute, and unconditional pardon from Connecticut's Board of Pardons and Paroles. Mr. Thompson is now entitled to waiver of removal under the Pardon Waiver Clause. But Defendant DHS continues to detain him, consistently with Defendants' new policy and practice of denying Connecticut pardon recipients the benefit of their full and unconditional state pardons.

65.    Richard Thompson has now been detained for more than two years since receiving his pardon. For all that time, he has not been working, supporting his family, or paying taxes.

66.    To cite yet another instance of Defendants' policy and practice: In the 1970s, Canadian national Raymond LaRiviere was convicted of two misdemeanor offenses in Connecticut. Mr. LaRiviere returned to Canada. In the spring of 2019, he applied for a full and unconditional pardon from Connecticut. On May 31, 2019, he received his pardon. But when he presented himself in or around the summer of 2019 at the land border between Canada and the United States, he was turned aside by CBP, a component agency of Defendant DHS, and informed that his Connecticut pardon did not remove his inadmissibility.

67.     Defendants continued to act in accordance with their policy and practice in the case of Wayzaro Walton, who came to the United States at the age of 3. Ms. Walton, a lawful permanent resident who married a U.S. citizen and gave birth to a U.S. citizen daughter, was convicted of larcenies in Connecticut, with the last offense occurring in 2011.

68.     Based on her convictions, ICE arrested, detained, and threatened Ms. Walton with removal in December of 2018. That detention continued even after Ms. Walton received a full, complete, absolute, and unconditional pardon from Connecticut's Board of Pardons and Paroles on January 15, 2019.

69.     Consistent with Defendants' policy and practice, ICE continued to improperly detain Ms. Walton for almost an entire year after that pardon – until, on December 5, 2019, Ms. Walton was granted relief by the Board of Immigration Appeals, which agreed with her that ICE and DHS are bound to respect Connecticut pardons. The BIA reasoned, correctly, that those pardons are individualized, discretionary, and therefore "executive" within the meaning of the Pardon Waiver Clause. *Wayzaro Walton*, A041 657 485 (BIA Dec. 5, 2019).

70.     Even after the Board of Immigration Appeals' ruling in December 2019, Defendants have continued their policy and practice of singling out Connecticut's pardon system and its residents for uniquely prejudicial treatment.

71.     Hongnakhorn Luangpraseuth came to Connecticut as an infant in 1978, the son of a Laotian refugee who fought Communism alongside American soldiers. He has been here ever since. Mr. Luangpraseuth was convicted of

offenses in his teens, but he could not be removed because he is stateless –
neither Laos nor Thailand will accept him.

72.     He lived in this country under an order of removal for 19 years – and,
during that time, he married a U.S. citizen and fathered U.S. citizen children. He is
a working, tax-paying, licensed electrician.

73.     In May 1, 2019, the State of Connecticut awarded Mr. Luangpraseuth
the second chance that he earned, granting him a full and unconditional pardon.
But when he applied for relief from removal, Defendant DHS responded , in
February 2020, by denying the impact of a Connecticut pardon under the Pardon
Waiver Clause.

74.     Similarly: Georgios Nikiforides is 49 years old and has lived in
Connecticut since he was two. He lives with, and cares for, his 80-year-old U.S.
citizen mother and his 16-year-old U.S. citizen son. He was convicted of offenses
in Connecticut – but, on January 7, 2020, he was granted a full and unconditional
pardon by Connecticut's Board of Pardons and Paroles. Still, on January 29,
2020, he was arrested by CBP agents and detained by ICE agents. He has been
detained ever since, in defiance of the INA's Pardon Waiver Clause.

75.     Defendant DOS, too, continues to adhere to and to apply its new
policy and practice. In a letter dated March 12, 2020, DOS' Bureau of Legislative
Affairs reaffirmed, in written correspondence to Connecticut's Attorney General,
that DOS "considers pardons issued by the Connecticut Board of Pardons and
Parole to be legislative pardons that do not remove a ground of ineligibility"
under the INA.

76.     In all of these instances, Defendants' actions reveal a clear policy and practice of denying the immigration benefits to which recipients of Connecticut's discretionary, individualized, executive pardons are entitled.

77.     Connecticut now seeks prospective relief on behalf of the State and its residents, who absent the intervention of this Court will continue to suffer unlawful arrest, detention, denial of entry, and other harms from Defendants' unconstitutional, arbitrary, capricious, and unlawful actions.

## CLAIMS FOR RELIEF

### I. First Claim for Relief: Violation of the Administrative Procedure Act – Not in Accordance with Law

78.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs.

79.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

80.     Defendants have a policy and practice of arresting, detaining, and excluding recipients of Connecticut's pardons. That policy and practice conflicts with the clear and well-established meaning of the Immigration and Nationality Act and its implementing regulations, including 8 U.S.C. § 1227(a)(2)(A)(vi); 8 U.S.C. § 1182; 22 CFR § 40.21; and 9 FAM 302.3-2(B)(3)(h).

81.     Because they adopted and implemented a pattern and practice in contravention of the correct and settled meaning of the INA, Defendants' conduct is "not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A). The violation causes ongoing harm to Plaintiff and its residents.

### II. Second Claim for Relief: Violation of the Administrative Procedure Act –

**Arbitrary and Capricious**

82.      Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs.

83.      The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

84.      Defendants' actions are arbitrary and capricious because they run counter to the evidence before Defendants about the legislative history and intent of the INA; ignore and depart from a long history of settled practice without explaining or even acknowledging the departure; rely on factors – including a test based on the state constitutional origin of the pardoning power that Defendants invented out of whole cloth – that Congress did not intend Defendants to consider; disregard material facts and evidence, including the pardon processes of other states whose practices are functionally identical in all relevant ways to those of Connecticut; and fail to consider the impact of their actions and the related costs to Connecticut and its residents, including the constitutional implications of Defendants' Tenth Amendment and equal sovereignty violations.

85.      Defendants' conduct is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A). The violation causes ongoing harm to Plaintiff and its residents.

**III. Third Claim for Relief: Violation of the Administrative Procedure Act – Contrary to Constitutional Right – and Violation of the Tenth Amendment to the United States Constitution**

86.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs.

87.     The Tenth Amendment to the United States Constitution provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Although the States surrendered many of their powers to the Federal Government when they adopted the Constitution,  "they retained 'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 919 (1997) (*citing* The Federalist No. 39, at 245 (J. Madison).

88.     That residuary sovereignty includes the States' power to organize their own government and to structure and operate their own criminal justice system. *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."); *Younger v. Harris*, 401 U.S. 37, 44 (1971) (barring federal interference with state criminal prosecutions); *Matter of Nolan*, 19 I&N Dec. 539, 544 (BIA 1988) )"[W]hether a state opts to authorize the granting of a pardon, and by what mechanism, for which offenses, and under what circumstances, are matters resting within the sovereign decision-making powers of that state.").

89.     Defendants' policy and practice of disregarding Connecticut's pardons purports to condition eligibility for a federal benefit on whether Connecticut has structured its pardoning power in a way that pleases Defendants. Here, Defendants seek to dictate not just the *content* of Connecticut

law but the *processes* and *mechanisms* by which Connecticut makes its law. Indeed, by declaring that the state cannot secure the benefits of the Pardon Waiver Clause through a statutorily-authorized (but not automatic!) pardon mechanism, Defendants would effectively coerce the Constitution State into rewriting its Constitution, at pain of federal disruption of the State's economy, communities, and family. That position violates the Tenth Amendment, because it impermissibly and coercively intrudes into Connecticut's sovereign power to structure its own government.

90. Defendants also purport to be able to identity specifically which executive-branch official must implement Connecticut's pardon power. That is a bridge too far: The federal government simply does not have the authority to either dictate the content of legislation passed by a state or to commandeer and supervise the state's executive officers, such as by ordering a specific officer to be the conduit for pardons. *See New York v. United States*, 505 U.S. 144 (1992).

91. The Constitution limits the federal government's "power. . . to secure state compliance with federal objectives." *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 576 (2012). Defendants cannot "exert a 'power akin to undue influence'" to force States to do the federal government's bidding. *Id.* at 577.

92. Threatening to arrest and detain Connecticut residents unless Connecticut changes its Constitution and laws is unduly coercive and impermissibly "destructive" of the State's "'residuary and inviolable

sovereignty.'" *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550, 554 (1985).

93.     Defendants' conduct is therefore "contrary to constitutional right" in violation of the APA. 5 U.S.C. § 706(2)(B). For the same reasons, Defendants' conduct violates the Tenth Amendment to the United States Constitution. The violation causes ongoing harm to Plaintiff and its residents.

IV. Fourth Claim for Relief: Violation of the Administrative Procedure Act – Contrary to Constitutional Right – and Violation of Constitutional Equal Sovereignty

94.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs.

95.     The Constitution protects each state's right to equal sovereignty with its sister states. *See Shelby County v. Holder,* 570 U.S. 529, 544 (2013) ("Not only do States retain sovereignty under the Constitution, there is also a fundamental principle of equal sovereignty among the States.") (internal quotation marks omitted). The Supreme Court taught in *Shelby County* that the federal government must make a showing of "current need" if it intends to impose disparate treatment among the states and their laws, departing from the principle of "constitutional equality of the States" that "is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.* at 542.

96.     Defendants have a settled history of respecting the efficacy of "executive" pardons issued by state pardon boards that work just like Connecticut's. Pardons issued by Georgia's Board of Pardons and Paroles – an

executive branch agency whose members are appointed by the state's governor, just as in Connecticut – have always been, and it appears continue to be, respected by Defendants. *See, e.g.*, *Matter of Tajer*, 15 I&N Dec. 125 (BIA 1974) (recognizing the efficacy under the Clause of pardons granted by the Georgia State Board of Pardons and Paroles). And, on information and belief, Defendants have continued to respect and accord full weight and efficacy to the pardons issued by the other four states with pardon schemes functionally identical in all relevant ways to Connecticut – Alabama, Idaho, Utah, and South Carolina.

97.    Notably, Connecticut is not the only one of those states that vests the pardon power in a board through statute. Alabama has a constitutional provision relative to pardons. Ala. Const. Art. V, § 124 (amended by Al. Const. Amend. No. 38). But that provision explicitly vests the state's pardoning power in the state legislature: "The legislature shall have power to provide for and to regulate the administration of pardons…" The Alabama legislature, not the state constitution, created that state's pardons board. And yet, on information and belief, the federal government continues to honor Alabama's pardoning power, which is plainly "legislative" in origin – if not, critically, in function.

98.    Here, Defendants have not even attempted to make any showing of need for engaging in a pattern and practice of treating Connecticut's pardon system – and its residents who receive pardons – differently from those of any other state, even those five other states whose systems are structurally identical to Connecticut's.

99.     Congress did not intend, in the Immigration and Nationality Act, to randomly select winners and losers from among the states, and the Constitution does not allow it.

100.    Defendants' conduct is therefore "contrary to constitutional right" in violation of the APA. 5 U.S.C. § 706(2)(B). For the same reasons, Defendants' conduct violates Plaintiff's constitutional right to equal sovereignty. The violation causes ongoing harm to Plaintiff and its residents.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.     Declare that Connecticut pardons are executive, governors' pardons within the meaning of the Pardon Waiver Clause and 22 CFR § 40.21;

2.     Declare that Defendants' policy and practice of denying and withholding the immigration benefits of Connecticut's full and conditional pardons is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

3.     Declare that Defendants' policy and practice of denying and withholding the immigration benefits of Connecticut's full and conditional pardons is unconstitutional under the Tenth Amendment and the constitutional principle of equal sovereignty, and is contrary to constitutional right, power, privilege, or immunity within the meaning of 5 U.S.C. § 706(2)(B);

4.     Hold unlawful, vacate, and set aside Defendants' policy and practice of denying and withholding the immigration benefits of Connecticut pardons;

**Amended Complaint / 30**

5.     Prospectively enjoin Defendants, and all their officers, employees, and agents, and anyone acting in concert with them, from arresting and detaining the recipients of full and unconditional Connecticut pardons under circumstances where a waiver of removal is warranted under the Pardon Waiver Clause;

6.     Prospectively enjoin Defendants, and all of their officers, employees, and agents, and anyone acting in concert with them, from denying admissibility to the recipients of full and unconditional Connecticut pardons, under circumstances where a waiver of ineligibility is warranted under 22 CFR 40.21.

7.     Award Plaintiff costs and attorney fees as allowed by law; and

8.     Grant other such relief as this Court may deem proper.

Dated: March 18, 2020                    Respectfully submitted,

WILLIAM TONG
Attorney General
State of Connecticut

MARGARET Q. CHAPPLE (CT # 05550)
Deputy Attorney General

VANESSA ROBERTS AVERY (CT # 21000)
Associate Attorney General

By: /s/ Joshua Perry
JOSHUA PERRY (CT # 439166)
Special Counsel for Civil Rights

165 Capitol Avenue
Hartford, CT 06106-0120
(860) 808-5318
Joshua.perry@ct.gov

*Attorneys for Plaintiff State of Connecticut*